UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
IINDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAULETTE FERRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-1968-DKL-WTL |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

*Entry on Judicial Review*

Paulette Ferris brings this action, seeking judicial review of the Social Security Administration's decision denying her applications for disability insurance benefits and supplemental security income. She argues that the Administrative Law Judge ("ALJ") erred by improperly weighing the medical opinion evidence regarding Ferris' capacity to sustain the mental demands of work and erred in making her credibility finding. Although Ferris has some physical impairments, the focus of this *Entry* is on her mental impairments. The parties have consented to have the undersigned Magistrate Judge conduct all proceedings in the case.

*Background*

Ferris claims that she became disabled on August 15, 2012, because of obesity and mental impairments of severe depression, anxiety, and post-traumatic stress disorder

("PTSD"). Ferris applied for a period of disability, disability insurance benefits, and supplemental security income. Her claim was denied initially and on reconsideration, and she requested a hearing before an ALJ. A video hearing was held in November 2013. Ferris, represented by counsel, appeared and testified. A vocational expert ("VE") also testified.

*Testimony*

Ferris testified was 38 years old at the time of the hearing. [R. 52.] She had two young sons, ages 6 and 9 and two adult children, ages 21 and 22. [R. 53.] She last worked at a CPA's office as a secretary in the front office during 2011 and 2012. [R. 41-42.] She stated that she tried to focus on her job but she had flashbacks from prior abuse. [R. 49.] As the office became busier, she found herself unable to deal with the stress and pressure, and she could not think straight or concentrate. [*Id.*] Ferris said that she could not stop worrying and thinking about other things that were going on. [*Id.*] She had "a really bad feeling around men." [R. 49.]

The day Ferris stopped working, August 15, 2012, she felt like she had been pushed over the edge. [R. 49, 52.] She had picked up a scanner and was about to throw it across the room, but pain from lifting the scanner stopped her. [R. 50.] She had been on reduced hours. [R. 52.] The ALJ asked Ferris to explain why she felt she could not work, and Ferris said that she struggled "in controlling [her] emotions. I have such sudden rage when I feel nervous and I feel nervous about everything." [R. 55.] She claimed to have a lot of obsessive and compulsive tendencies. [*Id.*] She added that when she is around people, she is "always scared and frustrated," which sends her into a rage. [R. 56.]

2

Ferris sees a primary care physician, Pamela Lynch, M.D. She sees a psychiatrist, Anne Leach, M.D., once a month and a therapist, Lori Nesbitt, LCSW, every two weeks. [R. 56, 79.] Her daughter comes over and checks that she and her young sons are taking their medications as prescribed. [R. 59.] Ferris stated that the medications and therapy have helped her with her emotional rages and made her a little more relaxed, but she still has "a lot" of flashbacks and does not sleep well. [R. 59-60.] She described side effects of her medications, including vertigo, drowsiness, and loss of consciousness at times. [R. 60.] She stated that the severity of her panic attacks was the same as before she was taking medication, but she has fewer attacks because she was home and had less stress since she was not working. She also has been learning how to handle the panic attacks. [R. 75-76.] Ferris said that she avoids men and does not go to the store alone. [R. 77.]

In a typical day, Ferris said that she receives assistance from her adult daughter with her daily activities, including caring for her younger siblings. [R. 61.] Ferris' sister cooks for her on the weekends and then during the week, Ferris microwaves the meals that were prepared. [R. 63.] Ferris struggles with cleaning the house and has assistance from others doing that. Ferris does not go out to socialize; she spends time with her kids and family. [R. 64.] When asked if she would like to return to work, Ferris answered, "no," because she believes that it would "put [her] back in the same place where [she] was a year ago" when she had a nervous breakdown and her doctor wanted to admit her for inpatient treatment. [R. 64-65.] Ferris stated that the thought of returning to work is overwhelming and causes her heart to palpitate, and she becomes dizzy and nauseous.

[R. 65.] She explained that being a single, working parent was frustrating and overwhelming. [R. 66.]

*Medical Evidence*

In October 2012, Paul Schneider, Ph.D, HSPP, a licensed psychologist, conducted a psychological evaluation of Ferris. He found that she "presented with an exaggerated degree of cognitive impairment, consequently invalidating the Mental Status Exam." [R. 406.] He thought it was difficult to make a diagnosis, but said "there may be a legitimate anxiety diagnosis," although his primary diagnosis was "Malingering." [R. 408.]

Ferris underwent another consultative psychological evaluation in January 2013 conducted by Alfred R. Barrow, Ph.D, HSPP, a licensed psychologist. He wrote that "[s]he presented as markedly distracted, hyper and periodically tangential and circumstantial in her statements. Her affect was both constricted and flat, while at other times, somewhat labile." [R. 454.] At times, she began "sobbing when describing her situation and difficulties she was having." [*Id.*] Barrow found Ferris' though processes "somewhat confused and, at time, slightly incoherent." [*Id.*] He conducted a mental status examination and concluded that her capacity for abstraction "appeared to be somewhat affected," her comprehension "appeared to be markedly limited and overly concrete," and her general memory functioning and concentration "appeared to be markedly affected, with considerable lack of focus." [R. 453-54.] Ferris was "somewhat disoriented to person, place, and time." [R. 454.] Barrow diagnosed her with Post Traumatic Stress Disorder, Chronic, and Major Depressive Recurrent, Moderate. [R. 455.] He assigned her a GAF score of 49, indicating serious symptoms or serious impairment

in functioning. In summary, Barrow noted that her "[o]verall cognitive efficiency appears to be markedly impaired, with general memory functioning, concentration, comprehension and capacity for abstraction appearing to be significantly affected." [*Id.*]

Ferris has treated with Dr. Lynch, her primary care physician, for several years. In August 2012, shortly after Ferris left work, Dr. Lynch wrote a "To Whom It May Concern" letter stating that Ferris was seen in her office and "will need to be off work for 2-4 weeks and then may return to part-time for the next 1-4 weeks. Full-time is undetermined at this time." [R. 356.] The doctor prescribed Xanax and started her on Lexapro. [R. 390, 392.] Ferris began counseling. [R. 392.] In September that year, Ferris reported that her son was coming home from Purdue to take care of his younger brothers; her daughter had explained that Ferris forgets to pick the boys up at school and was not feeding them at night. [R. 388.] A counselor thought a hospital admission would be beneficial, given Ferris' level of paranoia. [*Id.*] Ferris resisted in part because she feared losing her children, but agreed to be evaluated at the Emergency Room. [*Id.*] Ferris was assessed a GAF score in the 41-50 range, representing serious symptoms. [R. 392.] It was noted that she was "just hanging on with daily functions of care for children." [*Id.*] Later that month, Ferris saw Dr. Lynch, reporting that she was "feeling a little bit better." [R. 386]. Her daughter and her sister were helping her out. Dr. Lynch noted Ferris' current symptoms included feelings of losing control and difficulty concentrating. [*Id.*]

In December 2012, Ferris saw Dr. Lynch for anxiety and depression. The doctor noted that Ferris wanted a letter for disability and needed proof that her impairment would last longer than 12 months and that she could not work due to anxiety/depression.

5

[R. 436.] Dr. Lynch wrote that Ferris was seeing "psych" and on Xanax. She also noted that Ferris had worked several jobs "prior to this severe decline in all function." [R. 439.] Dr. Lynch said that Ferris was trying to deal with PTSD and had "a lot of healing to do." [*Id*.] It was noted that "[f]or full recovery to be a reliable single mother and employee likely will take a year. It is not that she can't work some job part time, but that she is unable to be a functional single parent and work any job currently." [*Id*.][1]

In January 2013, Ferris saw Dr. Lynch for follow-up of depression. Ferris reported that she was going to counseling every week and starting to see things more clearly. [R. 434.] The doctor noted that Ferris' depression was stable, "but very fragile and labile." [R. 436.] She opined that it "[w]ill likely take over 6 months to ensure stability based on current course. Will likely take 12 months to be functional enough to work." [*Id*.] In October 2013, Ferris followed-up with Dr. Lynch, reporting that she was "having a hard time with focus and concentration and emotions are still up and down." [R. 583.] She was attending counseling every two weeks. Dr. Lynch noted that Ferris' anxiety was limiting her ability to do things around people and she was depending on her older children to get groceries and help with the younger brothers. [R. 585.] She concluded that Ferris had memory difficulties, likely due to fibromyalgia and PTSD. [*Id*.] That month, Dr. Lynch wrote another "To Whom It May Concern" letter, stating that Ferris "is unable to work for an undetermined length of time due to her disabilities." [R. 554.]

---

[1] The ALJ mistakenly referred to this opinion as from December 2014; it was from December 2012. [R. 436.]

Ferris saw her psychiatrist, Dr. Leach on a monthly basis for mental health treatment.  In October 2012, Dr. Leach noted that Ferris "feels much less pressured not going to work" and that "her family is providing lots of assistance/support."  [R. 419.]  On exam, Ferris was alert, pleasant, and had good eye contact, but teary.  [*Id.*]  Dr. Leach continued her on Lexapro (for major depressive disorder) and added hydroxyzine (for anxiety).  The next month, Ferris had made progress in mastering her rage, and spent less time crying.  [R. 417.]

On January 2, 2013, Dr. Leach observed that Ferris "isn't making much progress and is determined not to return to work."  [R. 459.]  When Dr. Leach challenged Ferris about not returning to work, Ferris became "very defensive."  [*Id.*]  Yet Ferris reported that she was doing better, she could "control [herself] better" and had significant decrease in rages and anger.  [*Id.*]  Dr. Leach discussed with Ferris how to break up chores into small, doable pieces so as not to be overwhelmed, but noted that Ferris had "little motivation to attempt this."  [*Id.*]  Four weeks later, Dr. Leach wrote that Ferris "was seemingly high functioning for most of her life, but recently has had difficulties that she relates to history of abuse/trauma."  [R. 621.]  The psychiatrist noted that Ferris "has struggled with poor motivation, rage, poor stress tolerance, [but] she has shown definite improvement on combo [medications]."  [*Id.*]  Ferris reported that she was sleeping better and felt less emotional.  On mental status exam, Dr. Leach noted that Ferris was well groomed, pleasant and had good eye contact.  Her thought content was relevant, her affect was slightly constricted, and she became tearful when talking about her emotional problems.  [*Id.*]

In late May 2013, Dr. Leach reviewed Ferris' case with her therapist (Nesbit) who felt that Ferris' "progress is slow," though Ferris had indicated that she was not crying as much. [R. 630.] On exam, Ferris was alert, well-groomed and teary when discussing abuse. [*Id.*] She reported increased flashbacks but that her current medications had definitely decreased her anger and irritability. Dr. Leach noted that Ferris continued to experience symptoms of PTSD, and increased the frequency of her medication. [*Id.*]

In June Ferris told Dr. Leach that she noticed herself saying positive things and she could "kind of control" her temper. [R. 633.] Dr. Leach noted that Ferris was visibly improved, with clearer thoughts, no tearfulness, and significant decrease in anger. On exam, Ferris was alert, brighter, less anxious, more engaged, and less hopeless. [*Id.*]

In Late August 2013, Dr. Leach noted that Ferris was "very focused on getting disability" and "somatically focused." [R. 729.] Ferris had decreased therapy because her therapist had moved to another program, but the therapist agreed to see Ferris until a replacement was hired. [*Id.*] On mental status exam, Dr. Leach found that Ferris was alert, well-groomed, and "initially brighter," although she got "a little teary when discussing her sons' emotional struggles." [*Id.*] Her speech was normal rate and volume.

Beginning September 2012, Ferris attended weekly counseling sessions with Nesbitt. Nesbitt prepared a care plan for Ferris in November 2012, noting that anxiety and depression were interfering with her functioning in all domains. [R. 411.] Ferris said that she was overwhelmed by simple tasks and her anxiety affected her short term memory. [*Id.*] Nesbitt diagnosed PTSD, Major Depressive Disorder, Recurrent, Moderate, and Generalized Anxiety Disorder. [R. 412.] She assessed Ferris with a GAF

8

score of 50, indicating serious symptoms or serious impairment in social or occupational functioning. [*Id.*] Ferris' psychiatrist agreed with the diagnosis. [R. 414.]

At the November 2012 therapy session, Nesbitt noted that "[o]verall, I am seeing some improvement in coping and client is reporting less lability. However, depressive symptoms and anxiety continue to be debilitating." [R. 617.] At the December 2012 session, Ferris reported having had only one rage during the past week. [R. 619.] Nebsitt wrote that Ferris was "adamant she cannot return to work in any capacity because it is too stressful for her and she cannot manage the anxiety." [*Id.*] "Some progress" was noted overall, but Ferris was still overwhelmed about her ability to take care of her daily responsibilities.

March 2013's therapy session focused on Ferris' "goal to be able to manage her rage, anger, and anxiety so she is able to function in all domains." [R. 623.] Nesbitt wrote that Ferris was "making no progress in meeting goals." [*Id.*] Ferris was tearful and she reported more angry rages and much anxiety. Nesbitt indicated that Ferris did not think she could work because she could not take care of herself and kids. Nesbitt thought that Ferris' functioning had deteriorated and her anxiety and instability had increased. [*Id.*]

In mid-June 2013, Ferris reported she had seen "some improvement in her mood" and that she had less lability and less irritability. [R. 632.] A few months later, in August, Nesbit wrote that Ferris had reported "being a little anxious but feeling 'empowered'." [R. 634.] Nesbit also wrote that Ferris felt she had made progress since the year before and "learned a lot about herself this summer." [*Id.*] Although she continued to struggle with anger, Nesbitt said that Ferris felt she had fewer outburst and meltdowns. Ferris

9

was "utilizing more effective coping skills and relying on her own strengths more often." [*Id.*] Nesbit thought that it was appropriate to see Ferris bi-weekly. [*Id.*]

In September, Nesbit wrote that Ferris "states her rages and angry outbursts are less frequent and not as severe, but still occurring." [R. 637.] However, she continued to be "overwhelmed with anxiety, paranoia and is unable to accomplish simple daily tasks." [*Id.*] Nesbit noted that Ferris felt therapy was "very beneficial and much needed" and "has helped her a lot." [*Id.*] At the therapy session in mid-November, Nesbit noted that Ferris was "more upbeat today and did not cry as much. " [R. 641.] She was insightful and thoughtful and not as emotional. Ferris reported that she had not had any rages in over a week. [*Id.*] However, she said that she gets off track, can't stay on task, and was having difficulty with the upkeep of the house. [*Id.*]

In November 2013, Nesbit completed a mental residual functional capacity questionnaire for Ferris, noting that her current and highest GAF in the past year was 55, indicating moderate symptoms or moderate difficulty in social and occupational functioning. [R. 593.] She wrote that Ferris' therapy response had been positive, but she continued to experience some paranoia and rage. [*Id.*] Nesbit noted that Ferris' persistent and frequent flashbacks of trauma demonstrated the severity of her impairment. Nesbit checked boxes marking off Ferris' signs and symptoms, including anxiety, difficulty thinking or concentrating, and easy distractibility. [R. 594.] In Nesbit's opinion, Ferris was seriously limited in several abilities and aptitudes needed for even unskilled work, such as maintaining attention for two hours, and she was unable to meet competitive standards in other abilities such as dealing with normal work stress. [R. 595.] Nesbitt

10

opined that Ferris would be absent from work more than four days per month due to her impairments or treatment and that she would have difficulty working because she "experiences sudden rages when overwhelmed or frustrated." [R. 597.]

*The ALJ's Decision*

The ALJ issued a written decision, denying benefits. She found that Ferris met the insured requirements of the Social Security Act through December 31, 2016, and that she had not engaged in substantial gainful activity since her alleged onset date of August 15, 2012. [R. 18.] The ALJ determined that Ferris had severe impairments of obesity and mental impairments variously assessed as generalized anxiety disorder, major depressive disorder, and post-traumatic stress disorder. [*Id.*] She found that Ferris did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment and proceeded to assess her residual functional capacity ("RFC"). [R. 19-21.] The ALJ determined that Ferris had the RFC to perform a limited range of light work with several postural and mental limitations. [R. 21.] More specifically, the ALJ found:

> Mentally the claimant has the capacity to understand, remember, and carry out simple, routine tasks. In so doing, the claimant has the capability to utilize common sense understanding to carry out instructions, to deal with several concrete variables in standardized situations, and to sustain this mental ability consistent with the normal demands of a workday…. The claimant has the capacity to appropriately interact with supervisors and for occasional interaction with coworkers and the general-public. Occasional interaction with coworkers and general-public was defined as having the ability to work in vicinity of coworkers and the general-public, but actual interaction for completion of job tasks is limited to one third of the work day. The claimant has the capacity to identify and avoid normal work place hazards and to adapt to routine changes in the work place.

[R. 21.] With this RFC and based on the VE's testimony, Ferris was found unable to perform her past relevant work but capable of performing other jobs existing in significant numbers in the national economy. [R. 26-27.] Therefore, the ALJ concluded that Ferris was not under a disability and denied benefits. [R. 27-28.]

*Discussion*

Judicial review of an ALJ's decision is limited. *See Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). An ALJ's decision will be upheld if the ALJ applied the correct legal standards and the decision is supported by substantial evidence. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). This Court may not reweigh the facts or evidence or make its own credibility determinations. *Id.* An ALJ need only "minimally articulate" her reasons for rejecting or accepting evidence, which has been described as a very "lax" standard. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). An ALJ need not mention every piece of evidence, but must build a "logical bridge" from the evidence to her conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

Ferris argues that the ALJ erred in evaluating the opinion evidence when assessing her ability to sustain the mental demands of work. Controlling weight is given to a treating source's opinion as to the nature and severity of the claimant's impairments only if the opinion is well-supported by medically acceptable objective evidence and not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). If a treating source's opinion is not given controlling weight, the ALJ evaluates several factors

to determine the weight to give the opinion: the length of the treatment relationship and frequency of examination; the nature and extent of the relationship; supportability by relevant evidence; consistency with the record as a whole; and the source's specialization, if any. *Id.* at § 404.1527(c)(1)–(6). An ALJ must provide "good reasons" for the weight given to a treating source's opinion. *Id.* at § 404.1527(c)(2).

Although the ALJ discounted the opinions of the treating sources which favored a finding of disability, she gave adequate reasons for doing so. She gave Dr. Lynch's August 2012 opinion that Ferris needed to be off work "limited weight" because it was offered after Ferris' acute episode at work, "it was intended as a temporary restriction," and did "not offer quantifiable functional limitations." [R. 25.] These are all accurate assessments. Nonetheless, Ferris argues that Dr. Lynch's other opinions show that her need to be off work was not temporary. The ALJ, however, gave good reasons for according little weight to those subsequent opinions as well. In December 2012, Dr. Lynch stated that Ferris could not function as a single parent and work; the ALJ gave this opinion little weight because it considered factors outside the framework for a social security disability determination. *See, e.g.*, *Maguire v. Comm'r of Soc. Sec. Admin.*, No. 4:13-cv-2545, 2014 WL 7238678, at *4-5 (N.D. Ohio Dec. 17, 2014) (concluding ALJ reasonably did not credit evaluator's recommendation of a part-time work schedule based in part on claimant's status as a single parent with three children); *Anderson v. Astrue*, No. 1:11-cv-476-DBH, 2012 WL 5256294, at *10 (D. Me. Sept. 27, 2012) (holding ALJ found treating source's opinions that claimant had disabling impairments inconsistent with the record for good reasons, including the evidence that claimant left his job because he felt he could

not work and meet his responsibilities as a single parent of a young child), *adopted by* 2012 WL 5252259 (D. Me. Oct. 23, 2012). And it did: Dr. Lynch's opinion that Ferris could not work was based in part on her status as a single parent.

In January 2013, Dr. Lynch opined that it would "likely take 12 months for [Ferris] to be functional enough to work." [R. 436.] The ALJ gave this opinion limited weight because it was on an issue reserved for the Commissioner, which it was, and did not offer quantifiable functional limitations supported by clinical findings; it did not. The ALJ discounted Dr. Lynch's opinion from October 2013 for the same two reasons. These were adequate reasons for giving limited weight to these opinions. *See, e.g.*, *Lugo v. Colvin*, No. 14 C 577, 2016 WL 878205, at *7 (N.D. Ill. Mar. 8, 2016) ("A claimant … is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.' Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability.") (citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)); *Dingess v. Colvin*, No. 3:13-12562, 2014 WL 3512847, at *11 (S.D. W. Va. July 14, 2014) (ALJ properly discounted disability opinion where the physician identified psychiatric symptoms, not quantifiable functional limitations); *but see Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013) (stating the ALJ was not bound by a physician's statement that the claimant would be unable to return to any employment, but the ALJ should have asked the physician to indicate what functions the claimant was incapable of performing).

Moreover, the ALJ considered the entire evidence in the record in determining the weight to give opinion evidence, including the February 2013 opinion of the state agency

14

psychological consultant J. Gange, Ph.D., that Ferris had a severe mental impairment but retained the ability to meet the mental demands of unskilled work. [R. 24-26; see R. 112.] The ALJ also indicated, correctly, that Ferris' psychiatrist Dr. Leach had noted that Ferris had a resistance to return to work and focused on somatic complaints. [R. 25; *see* R. 459, 729.] From all the evidence, the ALJ concluded that Ferris had an acute attack on the alleged onset date of disability but "recovered sufficiently within twelve months … to meet the mental demands of unskilled work." [R. 26.] Substantial evidence supports this conclusion.

Ferris submits that Dr. Lynch's opinion was buttressed by consultative psychological examiner Dr. Barrow's opinion and by therapist Nesbit's functional assessments. While this may be true, the ALJ also gave good reasons for giving the latter opinions limited weight. She explained that Dr. Barrow's opinion was somewhat vague, but more importantly, was offered in January 2013, before Ferris achieved significant benefit from consistent treatment. Ferris objects that the ALJ's reasoning is flawed because the record shows some benefit from treatment between her acute attack and January 2013. While she saw some improvement during that time, she saw even greater improvement thereafter. For example, in June 2013, Dr. Leach observed that Ferris was visibly improved, and her mental exam showed improvement as well. By August 2013, Nesbit determined that bi-weekly therapy rather than weekly therapy was appropriate. The ALJ's decision is not internally inconsistent.

Furthermore, Nesbit was not an "acceptable medical source," which means that her opinion was not entitled to controlling weight. As an "other medical source,"

15

however, her opinion was entitled to consideration, *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); 20 C.F.R. § 404.1513(a), which it was given.  In considering the opinion, the ALJ found that Nesbit did not support her functional assessment with a narrative.  Although the mental residual functional capacity questionnaire repeatedly asked for medical/clinical findings that supported the assessment and had space for Nesbit to provide such information, Nesbit failed to identify such findings.  [R. 595-96.]  In addition, the ALJ reasoned that Nesbit's assessment was not fully supported by clinical findings and observations in the record.  While the record showed that Ferris had severe mental impairments, it also reflected her overall improvement with consistent treatment in 2012 and 2013.  The ALJ reasonably found that the record did not support the extreme limitations Nesbit opined Ferris had in November 2013.

Ferris also challenges the ALJ's credibility determination.  An ALJ complies with SSR 96-7p if she gives specific reasons supported by the record for a credibility determination.  *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).  The ALJ "need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012).  The inclusion of "meaningless boilerplate" does not automatically undermine the credibility finding as long as the ALJ gave good reasons supported by the evidence for discrediting the claimant's allegations.  *See, e.g.*, *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).  Here, the ALJ provided adequate reasons for her credibility finding.  She explained that Ferris' treating sources Dr. Leach and Nesbit indicated an initial lack of commitment to treatment and seeming unwillingness to return to work.  [R. 22; *see* R. 459, 619.]  The ALJ also explained that Ferris was reacting to her circumstances, including

family stressors, such as being a single parent, which contributed to and exacerbated her mental impairments. [R. 22.] Finally, the ALJ reasoned that although the record suggested continued issues, it showed improvement in Ferris' mental functioning "after a commitment to therapy and medication." The ALJ provided specific, adequate reasons supported in the record for her adverse credibility determination; therefore, it will not be overturned.

*Conclusion*

For the foregoing reasons, the Commissioner's final decision is **AFFIRMED**.

ENTERED THIS DATE: 03/30/2016

*Denise K. LaRue*
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Electronic distribution to counsel of record